IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

**LORI J. MASTISON,**
**Plaintiff,**

**v.**                                             **No:  5:07cv129/RS/MD**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**
**Defendant.**

_____

## REPORT AND RECOMMENDATION

This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Rules 72.1(A), 72.2(D) and 72.3 of the local rules of this court relating to review of administrative determinations under the Social Security Act and related statutes.  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Social Security Act for review of a final determination of the Commissioner of Social Security (Commissioner) denying claimant Mastison's application for Supplemental Security Income benefits under Title XVI of the Act.

Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are not supported by substantial evidence; thus, the decision of the Commissioner should be reversed and remanded for further consideration.

## PROCEDURAL HISTORY

Plaintiff filed an application for SSI benefits claiming a disability onset date of January 1, 2003.  Her application was denied initially and on reconsideration and she requested a hearing before an Administrative Law Judge (ALJ).  A hearing was held on October 5, 2005 at which plaintiff was represented by counsel and testified.  A vocational expert also testified.  The ALJ rendered an unfavorable decision on April 21, 2006 (tr. 14-21) and the Appeals Council declined review (tr. 7-10), making the decision of the ALJ the final decision of the Commissioner, and therefore subject to review in this court.  *Falge v. Apfel*, 150 F.3d 1320 (11th Cir. 1998).  This appeal followed.

## FINDINGS OF THE ALJ

Relative to the issues raised in this appeal, the ALJ found that plaintiff had severe conditions of (1) a history of deep vein thrombosis (DVT); (2) a history of dysthymic disorder; (3) a history of polysubstance abuse (in remission); and (4) a history of bilateral knee pain; that she did not have a condition or combination of conditions that met or equaled one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1; that she had the residual functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently, could sit and stand/walk for a total of four hours each in an eight hour workday but should be allowed to alternate between sitting and standing/walking every 30 minutes and required a hand held assistive device such that she could use only one hand to lift and carry while walking and standing; that she was a younger individual with a limited education who could not perform her past relevant work; that considering her age, education and work experience and residual functional capacity, there were jobs that existed in significant numbers in the national economy that she could perform; and that she was not disabled as defined in the Act.

## STANDARD OF REVIEW

The ALJ's decision will be reversed only if it is not supported by substantial evidence. *Falge, supra*. The court must determine whether the Commissioner's decision is supported by substantial evidence in the record and whether it is premised upon correct legal principles. *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles." *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983). In determining whether substantial evidence exists, the court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Commissioner's decision. *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)(citations omitted). Findings of fact by the Commissioner that are supported by substantial evidence are conclusive. 42 U.S.C. § 405(g); *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996).

A disability is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)-(f), the Commissioner analyzes a claim in five steps. A finding of disability or no disability at any step renders further evaluation unnecessary. The steps are:

1.      Is the individual currently engaged in substantial gainful activity?

2.      Does the individual have any severe impairment?

3.      Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.      Does the individual have any impairments which prevent past relevant work?

5.      Do the individual's impairments prevent any other work?

The claimant bears the burden of establishing a severe impairment that keeps her from performing her past work.  If the claimant establishes such an impairment, the burden shifts to the Commissioner at step 5 to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.  *Chester v. Bowen*, supra, 792 F.2d at 131; *MacGregor v. Bowen*, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, claimant must prove that she cannot perform the work suggested by the Commissioner.  *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987).

## PLAINTIFF'S MEDICAL HISTORY

As noted above, the ALJ found that plaintiff suffered from several severe conditions.  Plaintiff's problem with DVT, her dysthymic disorder and her history of polysubstance abuse have not been raised as issues in this appeal.  Although reference is made at times to plaintiff's DVT, which will be discussed as appropriate below, the thrust of the plaintiff's claim is that she is disabled primarily due to bilateral knee pain.  Therefore, the following summary will focus on that issue.

Early in the application process, the state agency referred plaintiff for a consultative examination by Kris Lewandowski, M.D., an internist, who examined plaintiff on September 19, 2003.  Dr. Lewandowski's examination of plaintiff's legs and knees disclosed no swelling, tenderness or deformity; that the knees were 100%

mobile on passive and active movement and that the muscles were normal in size and strength; that there were no neurological defects, and straight leg raising was negative.   Dr. Lewandowski's impression was that physical examination did not reveal any significant abnormalities except crepitations[1] in the left knee (tr. 176-178).

Plaintiff's primary treating physician was Joseph D. Hatcher, D.O., a family practitioner.   Karen Baxley, PA-C, was Dr. Hatcher's certified physician assistant. Dr. Hatcher's records are extensive, covering the period from February, 2003 to July, 2005.[2]  Over that period Dr. Hatcher and Ms. Baxley saw plaintiff for common medical problems, but also treated her for difficulties with her knees.   It is not clear when plaintiff first complained about knee pain, but the earliest entry to address it with any specificity is dated March 7, 2003.   On that visit an examination of plaintiff's knees revealed normal range of motion, but "'crunching' sounds of bone on bone."  (Tr. 344, 348).   Knee x-rays were ordered, but no x-ray report appears in the record.

On September 2, 2003 Ms. Baxley noted that plaintiff was in for follow up and was going to be referred for an MRI of both her knees.   She noted complaints of constant, chronic knee pain bilaterally.   Plaintiff reported that she heard a lot of crunching and degenerative changes in her joint space.   She indicated further that she had once had fluid removed from her knees but had never had an MRI.   Plaintiff was not taking any anti-inflammatory medications due to a blood disease (presumably DVT) that required her to take Coumadin (tr. 328-29). Shortly thereafter Ms. Baxley wrote a letter concerning food stamps, in which she stated that plaintiff

---

[1]  Crepitation: a dry sound like that of grating the ends of a fractured bone. *Dorland's Pocket Medical Dictionary*, 27th Edition.

[2]  In the administrative record Dr. Hatcher's records are a jumbled collection of pages.  He apparently provided his records to counsel or to the ALJ on several occasions, and each group is numbered serially.  However, some pages are missing from some sets, yet appear in others.  Some sets are in chronological order front to back, and others back to front.  Consequently, deciphering Dr. Hatcher's records has been difficult.  The undersigned believes that his complete office notes are in the administrative file.  Missing, however, are any reports from other providers.  For example, Dr. Hatcher makes reference to x-rays and MRIs, but the reports from the radiologists are not in his records, and the reports do not appear elsewhere.

was physically unable to work because of blood problems and a longstanding history of osteoarthritis in both knees and her low back (tr. 337).

On October 2, 2003 Ms. Baxley noted that plaintiff still complained of chronic knee pain bilaterally.  The MRI scan apparently indicated that there was some increased activity or intensity in the femoral condyle.  The notes reflect that a nuclear medicine bone scan was recommended and would be scheduled.  Ms. Baxley felt that the problem was most likely inflammation and arthritis in the knees. She also noted that plaintiff could not take anti-inflammatory medications because of her DVT.  There is no copy of the MRI report or the nuclear bone scan in the administrative record (tr. 323)

Plaintiff returned to Dr. Hatcher's office on November 11, 2003.  Plaintiff's bone scan was reviewed but it was very non-specific.  It indicated that there was some mild uptake in her right knee possibly due to degenerative arthritis.  It was again noted that plaintiff could not take any anti-inflammatory drugs due to her DVT. The assessment was chronic knee pain, not resolving (tr. 321).

Plaintiff returned to Dr. Hatcher's office on January 16, 2004.  Ms. Baxley reported that plaintiff continued to complain of her bilateral chronic knee pain, indicating that it was getting worse.  She described an incident in a retail store where she was reaching for something on the bottom shelf and could not get back up because her knees locked.  She was using a cane to assist her in walking.  She also complained of left hip pain radiating into the knees, and that the inside of her knees were tender late in the afternoon.  On physical examination there was sensitivity to deep palpation above and alongside the patellas on both knees. Plaintiff was scheduled to see Dr. Fitzgerald, who was treating her for her DVT, a month later and would talk to him about the possibility of using Prednisone or Vioxx for her knee problem (tr. 315).  It is unknown whether this ever happened.

Plaintiff was referred to Richard M. Laubaugh, M.D., an orthopedic surgeon, by Dr. Hatcher.  Dr. Laubaugh noted that there was crunching, popping and swelling

in both knees, the right more so than the left.  Plaintiff indicated a sensation of locking bilaterally, especially when descending stairs.  She indicated that the symptoms seemed to be gradually worsening.  She reported a history of fluid withdrawal ten years prior and stated that she injured her knees while skiing at about age 15.  Presently there was a great deal of pain with walking.  Dr. Laubaugh reviewed her MRI and noted abnormalities in the condyles of both femurs medially and laterally and indicated this could account for some of the pain she was having. He felt that a second opinion on the MRIs would be in order and that she would be rechecked at the next scheduled appointment (tr. 266).  Plaintiff returned to Dr. Laubaugh on February 17, 2004.  She told him that walking caused pain and swelling in her knees, and that her knees gave out frequently, causing her to fall.  On examination both knees were diffusely swollen.  There seemed to be pain with stress on the collateral ligaments but there was good range of motion.  There was no ligament laxity or pain on the McMurray test.  Dr. Laubaugh again indicated that he would like to have another physician review the MRI films (tr. 265).  The record is silent on whether this was done.

Plaintiff then saw Leo Chen, M.D., an orthopedic surgeon, on March 23, 2004. Dr. Chen noted that plaintiff had two or three years of bilateral knee pain with a significant increase in pain over the past six to twelve months.  She said she had been told by an orthopedic surgeon that an MRI had disclosed small black spots at end of the bone and that the bone was not healthy or alive.  Plaintiff reported associated swelling and mechanical symptoms.  On physical examination there was joint pain and swelling but no stiffness or muscle cramps.  There was no tenderness around the patella but there was diffuse medial joint line tenderness on the right. There was some positive crepitus bilaterally but the ligaments were within normal limits. Dr. Chen's assessment was bilateral knee pain with possible osteochondritis. Dr. Chen did not have any of the previous x-ray, MRI or bone scan studies and indicated that he would follow up when he received all the studies (tr. 262-263).

Plaintiff returned to Dr. Chen on June 30, 2004 again complaining of bilateral knee pain. On examination there was bilateral swelling, greater on the right, normal range of motion with diffused joint line tenderness.  There was crepitus bilaterally but normal ligaments. Dr. Chen reviewed the MRI and indicated that both knees showed foci of signal abnormalities in the distal view, consistent with possible necrosis and bony infarct.  Dr. Chen indicated that the MRI studies should be repeated and that he would have a local radiologist reevaluate them (tr. 261).  The administrative record does not show that there was a repeat MRI, or that a radiologist reevaluated the films.

Plaintiff returned to Dr. Chen on August 23, 2004 continuing to complain of knee pain.  There was no significant change from her previous examination.  Dr. Chen wrote "please see dictated reports" for MRI, and that there was still evidence of medullary infarcts bilaterally in both distal femurs.  Dr. Chen recommended that plaintiff go to the Shands Hospital at the University of Florida for a consultation with a musculoskeletal oncology specialist for evaluation of her knee problem (tr. 260).

Plaintiff returned to her regular treating physician, Dr. Hatcher, on August 31, 2004.  She told Ms. Baxley that she was having a lot of knee pain and back pain.  She stated that she was going to Gainesville to see a specialist related to her knee pain.  She further stated that the specialist told her that she had decreased blood flow to both patellas.  Ms. Baxley felt that plaintiff obviously had chondromalacia, meaning degeneration or deterioration in the articular cartilage, which was very painful (tr. 296).  There is no documentation in the administrative file showing that plaintiff ever went to Shands Hospital in Gainesville, although plaintiff told Ms. Baxley that she had.  However, at the hearing plaintiff told the ALJ that Dr. Hatcher had referred her to Dr. Chen.  Then the following discussion occurred:

> Q.     And what did this doctor do for you?
>
> A.     He just looked at MRI's and he was the one that referred me to go to the Shands hospital.

Q.    Have you had any knee surgery?

A.    No sir, I can't have - -

Q.    Have you ever had any scope or arthroscopic surgery?

A.    No sir.  I've had nuclear bone scans and MRIs.

(Tr. 393).  There were no further questions by the ALJ about Shands, or about why plaintiff could not have surgery.

Plaintiff returned to Dr. Hatcher's office on September 28, 2004.  Karen Baxley noted that plaintiff's knee pain was worse, and that she was taking Lortab more frequently (tr. 295).  On January 17, 2005 plaintiff was still complaining to Ms. Baxley of knee pain (tr. 287) and made the same complaint on March 25, 2005 (tr. 284).  On April 25, 2005 plaintiff indicated that she had excruciating knee pain, that Lortab was not helping and that she had not heard back (presumably from Gainesville) about possible surgery on her knees (tr. 282).

On October 3, 2005, two days before the hearing before the ALJ, Dr. Hatcher wrote a letter stating that plaintiff had been a regular patient since February 2003; that she had a long-standing history of chronic back and knee pain with severe chondromalacia of both knees; that she was unable to sit or stand for any prolonged period of time and had very limited mobility in her knees due to severe pain and abnormality of the bone structure.  Further, due to her blood disorder, she was unable to have knee replacement surgery.  She presently walked with the assistance of a cane, and due to the severe nature of her musculoskeletal condition, she was unable to work.  Dr. Hatcher further noted that plaintiff "is also referred to a neuro muscular specialist and we are going to see if there is anything we can do for her chronic chondromalacia in her knees." (Tr. 365).  Finally, he stated that it was an unfortunate event that such a young woman had such bad bone structure along with her blood abnormality.  "Due to these two underlying and severe conditions, work is not feasible." (*Id.*).  Dr. Hatcher also filled out a physical capacities evaluation

form and a clinical assessment of pain form in which he opined that plaintiff could sit for four hours a day with frequent breaks, could sit at any one time for no more than 30 minutes, could stand or walk for four hours in a day, could stand or walk for less than 30 minutes at a time, would need to lie down several times a day to elevate her legs, could lift or carry less than five pounds occasionally, could not drive for any extended period of time, and that her medication, specifically Lortab, had the side effect of sleepiness and disorientation (tr. 366-69).  On another form Dr. Hatcher indicated that physical activities such as walking or standing would increase plaintiff's pain to a degree as to cause distraction from or abandonment of task, and that the medication prescribed would have side effects that would be expected to limit effectiveness due to distraction, inattention, drowsiness, or forgetfulness (tr. 370-371).

## DISCUSSION

The plaintiff argues that the ALJ erred in failing to give appropriate weight to Dr. Hatcher's opinions and in improperly discounting plaintiff's subjective complaints of pain,  and that plaintiff was disabled from her onset date as a matter of law.   The Commissioner argues that the ALJ's findings were supported by substantial evidence and must, therefore, be sustained.   The issue thus presented is whether the ALJ's decision that the plaintiff was not disabled, in light of her physical condition, age, education, work experience, and residual functional capacity, is supported by substantial evidence in the record.

This cause should be reversed for two reasons.  First, the record is woefully incomplete.  Second, the ALJ improperly found that Dr. Hatcher was not a treating physician, and therefore an acceptable source.  Taken together, it is clear that the ALJ did not properly address the issues before him.  Moreover, given statements the ALJ made during the hearing, the court feels that the interests of justice require that the matter be referred to another ALJ.

With respect to the completeness of the record, as pointed out in the foregoing summary of plaintiff's medical history, there is a great deal of potentially important information missing from the administrative record.  A plaintiff has the burden of proving disability, and plaintiff here was represented by counsel, who presumably could have provided the missing records, or explained why they are not available.    Nevertheless, the Social Security disability benefits process is inquisitorial rather than adversarial, *Sims v. Apfel*, 530 U.S. 103, 110-111, 120 S.Ct. 2080, 2085, 147 L.Ed.2d 80 (2000), *Crawford & Company v. Apfel,* 235 F.3d 1298 (11th Cir. 2000), and is informal, *Richardson v. Perales,* 402 U.S. 389, 400-401, 91 S.Ct. 1420, 1426, 28 L.Ed.2d 842 (1971); *Kendrick v. Shalala*, 998 F.2d 455, 456 (7th Cir. 1993); 20 C.F.R. § 404.900(b).  With informality comes a duty to develop a complete record as is done by European magistrates.  *Kendrick,* 998 F.2d at 456.  It is well established in this Circuit that the ALJ has an affirmative duty to develop a full and fair record.  *Brown v. Shalala*, 44 F.2d 931, 934 (11th Cir. 1995); *Lucas v. Sullivan*, 918 F.2d 1567, 1573 (11th Cir. 1990); *Smith v. Bowen*, 792 F.2d 1547, 1551 (11th Cir. 1986); *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981).  The duty to develop the record exists even though the plaintiff is represented by a lawyer or paralegal.  *Brown*, 44 F.2d at 934 (citing *Clark v. Schweiker*, 652 F.2d 399, 404 (5th Cir.Unit B July 1981)); *Smith*, 792 F.2d at 1551 (citing *Cowart,* 662 F.2d at 735).  This duty requires that the ALJ "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts," be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited,"  *Cowart*, 662 F.2d at 735 (citations omitted), and "investigate the facts and develop the arguments both for and against granting benefits."  *Crawford & Company, supra*, 235 F.3d at 1304.

There are several things missing from this record, some probably minor, some not.  There are no radiology reports.  While Dr. Hatcher's and Dr. Chen's brief summaries of those reports are instructive, the ALJ, and the court, would have a better grasp of what was actually seen if the reports were available.  Second, if a

second MRI was done as indicated by Dr. Chen, and if a radiologist reevaluated the films, the record does not show it.  Finally, and most importantly, plaintiff apparently saw one or more specialists at the Shands Hospital, and was allegedly told that she needed a knee replacement, but could not have the surgery because of her DVT medication.  The record contains nothing from Shands or from any specialist that either confirms or refutes this claim.  What is apparent is that at least one MRI showed possible necrotizing tissue on one or both knees, that Dr. Hatcher and Dr. Chen were concerned about it, and that the ALJ was not.  This appears to be less than a scrupulous and conscientious probe, inquiry, and exploration of all relevant facts.

The second reason this cause should be remanded follows closely on the first.  It is obvious from a careful review of the (incomplete) medical record, and of plaintiff's testimony at the hearing, that knee pain and the Lortab, a synthetic narcotic she took for pain (apparently being unable, due to her DVT, to take less powerful medication), were the greatest cause of possible disability.  The ALJ approached plaintiff's knee problem in a less than thorough manner.  First, he did not seek out all the relevant records, as discussed above.  He brushed off plaintiff's testimony that she had been to Shands and could not have knee surgery.  This to some degree contradicts the statement in the ALJ's decision that he considered "treatment, other than medication, she receives or has received for relief of pain or other symptoms" (tr. 18) in making his determinations.  Second, he relied on a consultative report by Dr. Lewandowski that was a year old by the time it became apparent that plaintiff's knee problem was worsening, and was nearly four years old by the time of the ALJ's decision.  Ordinarily the timing of examinations is not crucial, but plaintiff's knee problems progressed over time.  The question of what her knee problem was had not been resolved.  The ALJ's reliance on Dr. Lewandowski's examination, which was done before any radiographic studies were

done on plaintiff's knees, without knowing what happened at Shands was misplaced.

Finally, and most critically, the ALJ gave little weight to, and failed properly to discount, the opinions of plaintiff's primary treating physician, Dr. Hatcher. Absent good cause, the opinion of a claimant's treating physician must be accorded considerable or substantial weight by the Commissioner. *Phillips v. Barnhart*, 357 F.3d 1232, 1240-1241 (11th Cir. 2004); *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *Broughton v. Heckler*, 776 F.2d 960, 960-961 (11th Cir. 1985); *Jones v. Bowen*, 810 F.2d 1001, 1005 (11th Cir. 1986). "Good cause" exists when: (1) the treating physician's opinion was not bolstered by the evidence; (2) the evidence supported a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's own medical records. *Phillips,* 357 F.3d at 1241; see also *Lewis*, 125 F.3d at 1440 (citing cases).

If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(d)(2). Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimants impairments. See *Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also Schnor v. Bowen,* 816 F.2d 578, 582 (11th Cir. 1987). When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on 1) the length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) medical evidence supporting the opinion; consistency with the record as a whole; 5) specialization in the medical issues at issue; and 6) other factors which tend to support or contradict the opinion. 20 C.F.R. 404.1527(d).

The opinion of a non-examining physician is entitled to little weight, and, if contrary to the opinion of a treating physician, is not good cause for disregarding the opinion of the treating physician, whose opinion generally carries greater weight. *See* 20 CFR § 404.1527(d)(1); *Broughton v. Heckler*, 776 F.2d 960, 962 (11th Cir. 1985); *Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir. 1984); *Hurley v. Barnhart*, 385 F.Supp.2d 1245, 1255 (M.D.Fla. 2005).   However, a brief and conclusory statement that is not supported by medical findings, even if made by a treating physician, is not persuasive evidence of disability. *Johns v. Bowen*, 821 F.2d 551, 555 (11th Cir. 1987); *Warncke v. Harris*, 619 F.2d 412, 417 (5th Cir. 1980).

"When electing to disregard the opinion of a treating physician, the ALJ must clearly articulate its reasons." *Phillips*, 352 F.3d at 1241.   Failure to do so is reversible error. *Lewis*, 125 F.3d at 1440 (citing *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986));[3] *see also Nyberg v. Commissioner of Social Security*, 179 Fed.Appx. 589, 591 (11th Cir. 2006) (Table, text in WESTLAW)(also citing *MacGregor*).

At the hearing, the ALJ questioned the plaintiff, a lay person, in such a way as to force her to admit, obviously without foundation, and in the ALJ's own words, that Dr. Hatcher "knows really nothing about knees - - - ." (Tr. 393).   Then, on being informed that plaintiff usually saw Dr. Hatcher's physician's assistant (not uncommon in the general practice setting), and had seen Dr. Hatcher, again in the ALJ's words, "[a] whole three times," he informed counsel that Dr. Hatcher was not a treating physician, and prevented counsel from examining the vocational expert concerning plaintiff's employability based on Dr. Hatcher's opinions.   Then, on being informed that Dr. Hatcher had signed all the records of Ms. Baxley's examinations and treatment, the ALJ responded "I don't care who it's signed by, she (the

---

[3] *MacGregor* further held that "Where the [Commissioner] has ignored or failed properly to refute a treating physician's testimony, we hold as a matter of law that he has accepted it as true." 786 F.2d at 1053.

vocational expert) doesn't see this - - - ."  (Tr. 421).[4]  This reaction is all the more surprising where the ALJ then relied on the opinion of an examining physician who was an internist, not an orthopedist, who had not seen any x-ray or other films, and who had seen plaintiff only once, nearly four years earlier.

Plaintiff argues that the ALJ's interjections and comments, and his ultimate findings, are not those of an impartial fact finder.  The undersigned does not go so far.  Nevertheless, it is apparent that the ALJ was less than scrupulous and conscientious in addressing Dr. Hatcher's opinions about plaintiff's knee problems.  At the very least, it was legal error to hold that Dr. Hatcher was not a treating physician,[5] and then to prevent counsel from examining the vocational expert based on Dr. Hatcher's opinions.  Indeed, the record contains a letter signed by both Dr. Hatcher and Ms. Baxley, nowhere mentioned by the ALJ, that explains very clearly that plaintiff was a regular patient of Dr. Hatcher's clinic; that she had severe chronic chondromalacia in her knees; that she had been referred to a specialist; and that given her DVT and the resulting requirement that she take Coumadin, which

---

[4]  In addition to all the other problems with the administrative record, the last three pages of the transcript of the hearing are missing.  *See* tr. 421-422, which disclose that pp. 40-42 of the hearing transcript are not in the record.

[5]  Title 20 C.F.R. § 404.1502 contains the following definition, to be used in Subpart P, applicable to this action:

> Treating source means your own physician . . . who has provided you with medical treatment or evaluation and who has or has had an ongoing treatment relationship with you.  Generally, we will consider that you have an ongoing treatment relationship with a physician. . . when the medical evidence establishes that you see or have seen the physician . . . with a frequency consistent with accepted medical practice for the type of treatment and evaluation required for your medical condition(s).  *We may consider a physician . . . who has treated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment is typical for your condition(s).*  We will not consider a physician . . . to be your treating physician if your relationship with the physician . . . is not based on your need for treatment, but solely on your need to obtain a report in support of your claim for disability.  In such a case, we will consider the physician . . . to be a consulting physician . . . .  (Emphasis added).

Thus, in order for a physician to be considered a treating physician under the regulations and for the greater weight rule to apply, the physician must (1) provide medical treatment or evaluation and (2) do so with such frequency as is consistent with accepted medical practice required by the condition.

interfered with treatment of her knees, plaintiff was severely limited in her activities and could not work (tr. 365).  Whether plaintiff can work is for the Commissioner to decide, but it is not for the Commissioner to ignore such information.

In an apparent attempt to undo what had been done at the hearing, the ALJ did refer to, and then discount, Dr. Hatcher's opinions in his written decision. He noted that Dr. Hatcher's opinions were inconsistent with his records, but did not identify any inconsistencies (tr. 18).   However, as noted above, he relied on the opinions of Dr. Lewandowski, who was an internist, and saw the plaintiff only once, nearly four years previously (tr. 17).   The ALJ also discounted the extent of plaintiff's knee problems by noting that plaintiff had seen Dr. Chen for only a short time, which was true, but the ALJ ignored Dr. Chen's advice that plaintiff be seen by a specialist at Shands, and the ALJ then did not determine what, if anything, happened at Shands Hospital (tr. 18).  These were insufficient reasons to discount Dr. Hatcher's opinion.

Whether plaintiff is disabled is not for this court to say.  However,  the ALJ had a duty to make a fair review of all medical information without pre-judging the impact of any particular physician's work, and to allow counsel to examine a witness based on relevant information.   The actions of the ALJ at the hearing are sufficient to bring his partiality into question.   The undersigned therefore concludes that this case should be reversed.

This court has the authority to "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing."   Title 42 U.S.C. § 405(g).  Remand is ordinarily appropriate for rehearing if the Commissioner failed to apply the law and regulations, or where the taking of additional evidence is necessary.  It is the law of this Circuit that where the ALJ fails properly to discount the opinion of the treating physician, he is held as a matter of law to have accepted it as true.  *MacGregor v. Bowen*, 786 F.2d 1050 (11th Cir. 1986).  When evidence has been fully developed and points unequivocally to a specific finding, the court may

enter the finding that the Commissioner should have made.  The court can reverse without remand where the Commissioner's decision is in plain disregard of the law and evidence.  *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *MacGregor, supra; Hale, supra.*  Moreover, the failure to apply the correct legal standard is grounds for reversal, not remand.  *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1983).  Given the lack of a full record here and the ALJ's legal error in not finding that Dr. Hatcher was a treating physician, this case should be remanded for further consideration consistent with this report.

Accordingly, it is respectfully RECOMMENDED that the decision of the Commissioner be REVERSED, that this cause be REMANDED for further proceedings, that the Commissioner be ordered to assign the case to a different Administrative Law Judge who will complete the record and determine whether plaintiff is disabled based on the entire record consistent with this report, that judgment be entered in favor of plaintiff pursuant to sentence four of 42 U.S.C. § 405(g), and that the clerk be directed to close the file.

At Pensacola, Florida this 10th day of April, 2008.

/s/ *Miles Davis*
**MILES DAVIS
UNITED STATES MAGISTRATE JUDGE**


**NOTICE TO THE PARTIES**

**Any objections to these proposed findings and recommendations must be filed within ten days after being served a copy hereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  See 28 U.S.C. § 636;** ***United States v. Roberts***, **858 U.S. 698, 701 (11th Cir. 1988).**